STATE OF CONNECTICUT *v.* JAMES L. DAVIS III
(SC 17271)

Borden, Norcott, Katz, Palmer, Vertefeuille, Zarella and Sullivan, Js.

Argued January 5—officially released July 31, 2007

*Elizabeth M. Inkster,* senior assistant public defender, for the appellant (defendant).

*Michael L. Regan,* state's attorney, with whom, on the brief, were *Kevin T. Kane,* chief state's attorney, and *Denise B. Smoker,* senior assistant state's attorney, for the appellant (state).

*Susan O. Storey,* chief public defender, *Martin Zeldis,* chief of legal services, and *Kevin Smith* and *Catherine Kollet,* certified legal interns, filed a brief for the office of the chief public defender as amicus curiae.

*Jon L. Schoenhorn* and *Conrad Ost Seifert* filed a brief for the Connecticut Criminal Defense Lawyers Association as amicus curiae.

*Denise B. Smoker* filed a brief for the office of the chief state's attorney as amicus curiae.

PALMER, J. The principal issue in this appeal is whether a criminal defendant has a state constitutional right to challenge the legality of a search, notwithstanding the fact that he had no reasonable expectation of privacy in the subject of the search, if he was legitimately on the searched premises or was charged with an offense of which possession of the seized item is an element. A jury found the defendant, James L. Davis III, guilty of manslaughter in the first degree with a firearm in violation of General Statutes § 53a-55a,[1] three counts of assault in the first degree in violation of General Statutes § 53a-59 (a) (5),[2] and carrying a pistol without a permit in violation of General Statutes § 29-35 (a).[3] The trial court rendered judgment in accordance with the jury verdict,[4] and the defendant appealed directly to this court pursuant to General Statutes § 51-199 (b) (3). On appeal, the defendant claims that (1) the trial court improperly denied his motion to suppress certain evidence seized by the police on the ground that he did not have standing to challenge the legality of the search under article first, § 7, of the state constitu-

---

[1] General Statutes § 53a-55a provides in relevant part: "(a) A person is guilty of manslaughter in the first degree with a firearm when he commits manslaughter in the first degree as provided in section 53a-55, and in the commission of such offense he uses, or is armed with and threatens the use of or displays or represents by his words or conduct that he possesses a pistol, revolver, shotgun, machine gun, rifle or other firearm. . . ."

[2] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when . . . (5) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of the discharge of a firearm."

[3] General Statutes § 29-35 (a) provides in relevant part: "No person shall carry any pistol or revolver upon his or her person, except when such person is within the dwelling house or place of business of such person, without a permit to carry the same issued as provided in section 29-28. . . ."

[4] The trial court imposed a total effective sentence of forty-eight years imprisonment.

tion,[5] (2) the evidence was insufficient for the jury to have found him guilty of the charges beyond a reasonable doubt, and (3) the trial court improperly charged the jury on reasonable doubt. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The events in question took place in the early morning hours of November 14, 1999, at the Sportsmen's Athletic Club (club) at 40 High Street in Norwich. Joseph Ellis arrived at the club with Susan Gomez at approximately midnight. Ellis had arranged to meet Jermaine Floyd, Timothy McCoy and Xavier Cluff there. The defendant, Susan Gomez' estranged husband, and Ricky Gomez, Ron Pires, Clayton Ballinger and Yolanda Pires were in the poolroom of the club when Ellis arrived. Ellis went to the bar area, accompanied by Floyd and McCoy, and saw Ricky Gomez and Ron Pires, both of whom he knew, looking at him through a service window between the bar and the poolroom. Ellis then left the bar area and went to the club's office to make arrangements for a birthday party. When he came out of the office, Ellis saw Ricky Gomez, Ron Pires and a third person whom he could not clearly see walk in and out of the bathroom several times. Ricky Gomez left the club, came back with something concealed under his jacket and again entered the bathroom. Gomez then left the bathroom, and, shortly thereafter, another person came out and started shooting a gun. The shooter's face was covered with a cloth of some type.

The shooter first shot Joseph Dubose. He then shot Ellis in the left leg and went to the front door of the

---

[5] The constitution of Connecticut, article first, § 7, provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

club, where he fired two more shots. He returned to Ellis and shot him in the right leg, upper right arm and armpit,[6] and left forearm. At that point, the cloth over the shooter's face slipped, and Ellis recognized him as the defendant.

At approximately 1:16 a.m. on November 14, 1999, members of the Norwich police department responded to an alarm at the club. Upon entering the club, they observed Dubose and Ellis lying on the floor with apparent gunshot wounds. One of the officers also observed that Floyd, who was able to stand on his own, had been shot in the buttocks. Emergency medical personnel transported Dubose, Ellis and Floyd to William W. Backus Hospital in Norwich. Cluff, who had been shot in the arm during the incident, arrived at the hospital by other means of transportation. Dubose was declared dead at approximately 2:11 a.m.

Later on the day of the shooting, members of the Norwich police department, assisted by members of the state police eastern district major crime squad, recovered ten spent .40 caliber shell casings and eleven bullet fragments from the scene of the shooting. The Norwich police recovered two additional bullet fragments on November 16, 1999. All of the shell casings had been fired from the same .40 caliber Glock semiautomatic handgun.

Several months prior to the shooting, in September, 1999, Wilfred Pepin had reported the theft of several guns, including a .40 caliber Glock semiautomatic handgun, from his residence in Lisbon. After the shooting, the Norwich police department contacted Pepin and inquired if Pepin had retained possession of any casings that had been discharged from the Glock handgun.

---

[6] There was conflicting medical testimony as to whether Ellis was shot in the upper right arm or upper left arm or both. Ellis testified that he was shot in both arms.

Pepin was able to find three casings that he thought may have been discharged from the gun and provided them to the police. Two of those casings matched the casings that had been recovered at the club.

On January 5, 2000, Adrianne Cook went to the Norwich police station and informed the police that the defendant was staying at her apartment at 29 Carpenter Street in Norwich and that he had refused to leave. The police went to the apartment and arrested the defendant for criminal trespassing. They also seized a black duffle bag from the room in which the defendant had been staying. The duffle bag contained a number of guns and gun paraphernalia that had been stolen from Pepin. Several of the items, including a gun case, a magazine clip, two screws, an Allen wrench and spare magazine holders, were linked to Pepin's .40 caliber Glock handgun, but the gun itself never was recovered.

Thereafter, the defendant was arrested and charged with the murder of Dubose by use of a firearm, the attempted murder of Ellis, three counts of assault in the first degree as to Ellis, Floyd and Cluff, and carrying a pistol without a permit. His first two jury trials ended in mistrials when the juries were unable to reach a unanimous verdict. After a third trial, the jury found the defendant guilty of the lesser included offense of manslaughter in the first degree with a firearm, three counts of assault in the first degree and carrying a pistol without a permit. The jury found the defendant not guilty on the attempted murder charge. This appeal followed.

On appeal, the defendant claims that the trial court improperly denied his motion to suppress the evidence seized from Cook's apartment on January 5, 2000, on the ground that, because he had no reasonable expectation of privacy in the searched premises, he had no right to challenge the legality of the search. Specifically,

he claims that he had standing to seek to suppress the fruits of the search under article first, § 7, of the state constitution. He further contends that there was insufficient evidence to support a finding of guilt beyond a reasonable doubt on the charges of which he had been convicted and that the trial court improperly charged the jury on reasonable doubt. We reject each of the defendant's claims.

## I

We first address the defendant's claim that the trial court improperly concluded that the defendant did not have standing under article first, § 7, of the state constitution to challenge the legality of the police search of Cook's apartment. In support of his claim, he contends that article first, § 7, of the state constitution affords greater protection than the fourth amendment to the federal constitution,[7] under which a defendant may challenge the legality of a search only if he had a reasonable expectation of privacy in the area or subject of the search. See, e.g., *Rakas* v. *Illinois*, 439 U.S. 128, 143, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978). In particular, the defendant maintains that, under our state constitution, he had automatic standing to seek to suppress the seized evidence because he had a "participatory" interest in the black duffle bag. He further claims that he had standing to challenge the legality of the search under the state constitution because he was legitimately on the premises searched or, alternatively, because he was charged with an offense of which possession of the seized evidence is an element. We conclude that

---

[7] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

the state constitution does not embody any of these rules of standing.

The following additional facts and procedural history are relevant to this claim. Before his first trial, the defendant filed a motion to suppress the handguns seized by the Norwich police department at Cook's apartment on January 5, 2000. The defendant claimed that the evidence should be suppressed because, although the police had a warrant to search the duffle bag, "[t]he probable cause established in the warrant affidavit . . . was based exclusively on the warrantless search and seizure of [the duffle] bag by the police before applying for the warrant."

The trial court held a hearing on the defendant's motion to suppress at which the following evidence was presented. During their investigation into the shooting, Norwich police officers identified the defendant as a possible suspect. On January 5, 2000, Cook's mother[8] and grandfather, Richard Woodly, called Cook and told her that the police were looking for the defendant and wanted to speak to her. The defendant, who was a first cousin of Cook's half-brother and half-sister and had known Cook her entire life, had been staying at Cook's apartment for about two weeks. Cook shared the apartment with her boyfriend, Leon Brown,[9] and their two year old daughter. Brown usually spent the day in the apartment but slept somewhere else at night. The apartment had three bedrooms, one of which Cook slept in, one of which her daughter slept in and one of which contained a couch. The bedroom with the couch had no door and served as the entryway to the only bathroom in the apartment. The defendant had slept on the couch in that bedroom while he was staying in the apartment. Cook had asked the defendant to leave the apartment

---

[8] Cook's mother is not identified by name in the trial testimony.

[9] Brown also was the defendant's friend.

on several occasions, but the defendant laughed at her and refused to leave.

After speaking to Woodly and her mother, Cook went with both of them to the Norwich police station and told the police that the defendant was at her apartment and would not leave. She asked them to remove him. She also gave two written statements to the police and signed a consent form authorizing a search of the apartment. In the first statement, Cook stated that she knew that the defendant was "wanted for questions regarding the shooting at the [club]. I am scared of [the defendant] and want him out of my apartment. I am scared something might happen to me or my daughter." In the second statement, Cook stated that, "[i]t scares me [because the defendant] is hiding and he won't leave the apartment at all. . . . I am scared [that the defendant] will hurt me or my daughter . . . . I don't know what he will do. I want the police to act on my behalf and want [the defendant] out of my apartment. I have no other options to get him out." The consent form authorized members of the Norwich police department to search Cook's "[r]esidence, including the curtilage and any [outbuildings] . . . ." It also authorized the police "to take from the location or locations . . . such materials and other property as they may desire and to perform examinations and tests, including forensic examinations and tests, on any item seized."

After obtaining the statements and the written consent to search from Cook, several police officers went to her apartment. Detectives Mark Rankowitz and Christopher Ladd, who were dressed as utility workers, knocked on the front door of the apartment. When the defendant answered, Rankowitz asked for Cook. The defendant responded that she was not at home, and Rankowitz asked him if he lived there. The defendant replied, "No." Rankowitz then identified himself as a

police officer and arrested the defendant on criminal trespassing charges.

After the defendant was arrested, Cook reentered the apartment, where the police were still present. Cook pointed out several items in the bedroom where the defendant had been staying that did not belong to her, including a black duffle bag. She asked the police to remove the items.[10] At that point, Detective Albert L. Costa, Jr., opened the black duffle bag and removed a smaller zipped bag. He opened the smaller bag and found several guns. Detective Scott Smith was present and observed that one of the guns was "a large frame revolver with [an] unfluted cylinder and custom Smith [and] Wesson [g]rips." Costa then closed the smaller bag and put it back into the duffle bag. Costa testified that the reason that he had opened the bags was to look for identification that might establish ownership. The police ultimately took the items to the police station. Rankowitz testified that, even if they had not known that the bag contained guns, the police would have taken the bag to the police station to be inventoried and returned to the defendant.

At about 9 p.m. on January 5, 2000, the Norwich police obtained a warrant to search the black duffle bag that had been seized at Cook's apartment. The warrant application stated that, in September, 1999, several guns had been stolen from a Lisbon residence, including a revolver similar to the one that had been observed in the duffle bag. It also indicated that the search of the bag was required to obtain evidence "that a particular person participated in the commission of the offense of: Larceny (Possession), Theft of a Firearm [General Statutes §] 53a-212 . . . ."

---

[10] Although Cook testified that she did not recall asking the police to do anything with the items that did not belong to her, Rankowitz and Smith testified that Cook told them that she wanted the items removed from the apartment.

At the conclusion of evidence at the suppression hearing, the defendant claimed that he had a reasonable expectation of privacy in the duffle bag and that, although Cook had consented to a search of the apartment, she did not have the authority to consent to a search of his personal property. Alternatively, the defendant asserted that he had automatic standing to challenge the legality of the search under the state constitution. The state maintained that the defendant had no expectation of privacy in the room where the duffle bag was found and that there was no evidence that the police or Cook knew that the duffle bag belonged to the defendant before Costa opened it.

The trial court concluded that the evidence established that, when the police opened the black duffle bag, they knew only that it did not belong to Cook, not that it belonged to the defendant. The court further concluded that, on the basis of the evidence adduced at the suppression hearing, the defendant had not established a reasonable expectation of privacy in the bag.[11] The court also indicated that it would allow the defendant to file a brief on the issue of automatic standing under the state constitution. Thereafter, the defendant filed a memorandum in support of his motion to suppress the black duffle bag in which he argued that, under the state constitution, he had "automatic standing to challenge the illegal warrantless search and seizure of the [black duffle] bag . . . ."

The defendant also had filed a separate motion to suppress certain statements that he had made after his arrest on the ground that he had not waived his *Miranda*[12] rights at the time that he made them. Specifically, he sought to suppress a statement that he had

---

[11] We note that the defendant did not testify at the suppression hearing, and the other witnesses at the hearing could not testify definitively that the duffle bag belonged to the defendant.

[12] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

made to police immediately after his arrest that he owned personal property in one of the bedrooms of Cook's apartment and a statement that he had made at the police station that one of the bags contained drugs. The trial court thereafter conducted an evidentiary hearing on the motion. The defendant testified at the hearing that, immediately after he was arrested, he told the police that he had clothes in some bags in the room where he had been sleeping. Timothy Menard, a lieutenant with the Norwich police department, was present in the apartment and testified that the defendant did not indicate which bags were his or what room they were in. After the defendant was taken to the police station, the police asked him what they would find in the bags if they opened them. The defendant responded that they might find "a little bit of drugs." The police found marijuana in the black duffle bag that contained the guns and gun paraphernalia. The trial court granted the motion to suppress as to the statement made by the defendant at Cook's apartment but denied it with respect to the statement made at the police station.[13]

The trial court then addressed the defendant's contention that he had automatic standing under the state constitution to challenge the legality of the search of the bag. The court concluded that the state constitution does not embody the doctrine of automatic standing.

On appeal to this court, the defendant initially claimed that the trial court improperly had determined that article first, § 7, of the state constitution does not confer automatic standing on a defendant who has a participatory interest in the subject of the search and

---

[13] The court's rulings on the defendant's motion to suppress his statements are not at issue in this appeal. We refer to the testimony concerning the defendant's motion to suppress his statements only because it also is relevant to his motion to suppress the fruits of the search of the black duffle bag.

seizure.[14] After oral argument before this court, however, we directed the parties to file supplemental briefs on the following issue: "If this court were to reject the state constitutional automatic standing rule as proposed by the defendant, that is, that version of the rule pursuant to which a defendant has standing to seek to suppress evidence if he or she has, inter alia, a 'participatory interest' in either the place or property seized; see, e.g., *State* v. *Alston*, 88 N.J. 211, 440 A.2d 1311 (1981);[15] should this court nevertheless adopt the rule of automatic standing as set forth in *Jones* v. *United States*, 362 U.S. 257, 80 S. Ct. 725, 4 L. Ed. 2d 697 (1960) [overruled by *United States* v. *Salvucci*, 448 U.S. 83, 100 S. Ct. 2547, 65 L. Ed. 2d 619 (1980)], pursuant to which a defendant has standing to seek to suppress evidence if he or she was legitimately on the invaded premises or has been charged with an offense of which possession of the seized item is an element?" The defendant filed a supplemental brief in which he contended that we should adopt the rule of automatic standing as a matter of state constitutional law,[16] and the state filed a supplemental brief in which it contended the contrary. We also invited the office of the chief state's attorney (chief state's attorney), the office of the chief public defender (chief public defender) and the Connecticut Criminal Defense Lawyers Association (association) to

---

[14] A participatory interest has been characterized as an interest that "stresses the relationship of the evidence to the underlying criminal activity and [the] defendant's own criminal role in the generation and use of such evidence, and confers standing on a person who had some culpable role, whether as a principal, conspirator, or accomplice, in a criminal activity that itself generated the evidence." (Internal quotation marks omitted.) *State* v. *Bruns*, 172 N.J. 40, 51, 796 A.2d 226 (2002).

[15] In *State* v. *Alston*, supra, 88 N.J. 228, the Supreme Court of New Jersey adopted the "participatory interest" test of standing under the New Jersey constitution. See footnote 14 of this opinion.

[16] We note that the defendant has not challenged the conclusion of the trial court that he failed to elicit evidence sufficient to establish his reasonable expectation of privacy in the black duffle bag. See footnote 11 of this opinion.

file amicus curiae briefs on the question. The association and the chief public defender accepted our invitation and filed amicus briefs in which they maintained that we should adopt the rule of automatic standing as a matter of state constitutional law. The chief state's attorney accepted our invitation and filed an amicus curiae brief urging us to reject the automatic standing rule.

Because the issues that the parties and amici address in the supplemental and amicus briefs more properly frame the issue before us, and because our analysis of those issues also disposes of the narrower issue raised by the defendant in his initial brief,[17] we limit our analysis to the issues addressed in the supplemental and amicus briefs.[18] Before addressing the merits of the defendant's claim, however, some background is necessary.

In *Jones* v. *United States*, supra, 362 U.S. 257, the United States Supreme Court set forth two alternative holdings: (1) when a defendant has been charged with a possessory offense, "[t]he possession on the basis of which [the defendant] is to be . . . convicted suffices to give him standing" to challenge the legality of a search; id., 264; and (2) "anyone legitimately on premises where a search occurs may challenge its legality by way of a motion to suppress, when its fruits are proposed to be used against him." Id., 267. The former rule subsequently became known as the "automatic standing" doctrine. See, e.g., *Rakas* v. *Illinois*, supra,

---

[17] In other words, if a possessory interest in the item seized or a legitimate presence on the premises searched does not entitle a defendant to challenge the legality of a search, then, a fortiori, proof of a vaguer and more attenuated "participatory interest" in the item seized or premises searched cannot entitle him to do so.

[18] In performing this analysis, however, we also consider the arguments that the parties made in their initial briefs, to the extent that they bear on our resolution of the dispositive issue in the case.

439 U.S. 135. Our courts occasionally have conflated the two doctrines, however, and referred to them collectively as the "automatic standing" rule. See, e.g., *State* v. *Hill*, 237 Conn. 81, 97 n.23, 675 A.2d 866 (1996) (automatic standing doctrine "confers standing on a defendant who is legitimately on the invaded premises or who has been charged with an offense of which possession of the seized item is an element"); *State* v. *Salvatore*, 57 Conn. App. 396, 400, 749 A.2d 71 ("[u]nder the rule of automatic standing, a defendant may seek to suppress evidence as the fruit of an illegal search if he or she was legitimately on the invaded premises or has been charged with an offense of which possession of the seized item is an element" [internal quotation marks omitted]), cert. denied, 253 Conn. 921, 755 A.2d 216 (2000). Because the rules have distinct histories, justifications and applications,[19] however; see generally *Jones* v. *United States*, supra, 262–67; it is appropriate to analyze them separately. Accordingly, we first consider whether our state constitution embodies the automatic standing rule and then consider whether it embodies the "legitimately on the premises" rule.[20] We conclude

---

[19] Specifically, the automatic standing rule applies only when the defendant has been charged with a possessory offense, whereas the "legitimately on the premises" rule is of general application. See *Jones* v. *United States*, supra, 362 U.S. 264 (government's charge of possession confers standing); id., 267 ("*anyone* legitimately on premises" has standing to challenge search [emphasis added]).

[20] The state argues that we should not address either of these issues because the defendant was not charged with possession of any of the seized evidence and was not legitimately on the searched premises. With respect to the state's first point, the defendant was charged with carrying a pistol without a permit during the incident at the club, and the state used the evidence seized at Cook's apartment to establish that the defendant did possess the pistol used in the shooting. We conclude that these charges were of a sufficiently possessory character to entitle the defendant to claim automatic standing.

With respect to the state's second point, the trial court did not reach the issue of whether the defendant was legitimately on the premises because it determined that such a finding would not entitle the defendant to challenge the legality of the search. The defendant had not been charged with criminal trespass at the time of the suppression hearing, and it is unclear from the

that article first, § 7, of the state constitution does not embody either rule of standing.

To provide context for our analysis of these issues, we review at the outset the history of the automatic and "legitimately on the premises" standing doctrines. In *Jones* v. *United States*, supra, 362 U.S. 258–59, the defendant, Cecil Jones, was arrested during the search of an apartment pursuant to a search warrant and charged with possession of narcotics. Before trial, Jones moved to suppress evidence obtained during the search, claiming that the warrant had been issued without probable cause. Id., 259. The government argued that he had no standing to challenge the search because he had alleged neither ownership of the seized items nor an interest in the apartment "greater than that of an 'invitee or guest.'" Id. The District Court denied Jones' motion to suppress for lack of standing. Id. The United States Court of Appeals for the District of Columbia affirmed the ruling on the alternate ground that the warrant had been legally issued and executed. See id., 260.

On appeal to the United States Supreme Court, that court stated that, "[o]rdinarily . . . it is entirely proper to require of one who seeks to challenge the legality of a search as the basis for suppressing relevant evidence that he allege, and if the allegation be disputed that he establish, that he himself was the victim of an invasion of privacy. But prosecutions like this one have presented a special problem. To establish 'standing,' Courts of Appeals have generally required that the movant claim either to have owned or possessed the seized

record whether the defendant ever was tried or convicted of that charge. The defendant argues that, if we were to adopt the "legitimately on the premises" rule of standing, the evidence in the present case would support a finding on remand that the defendant was legitimately on the premises. Because we cannot conclude that the evidence necessarily would be insufficient to support such a finding, we address the defendant's claim.

property or to have had a substantial possessory interest in the premises searched. [Because] narcotics charges like those in [Jones' case] may be established through proof solely of possession of narcotics, a defendant seeking to comply with what has been the conventional standing requirement has been forced to allege facts the proof of which would tend, if indeed not be sufficient, to convict him." Id., 261–62.

The court concluded, however, that this dilemma "presuppose[d] requirements of 'standing' [that it did] not find compelling. Two separate lines of thought effectively sustain[ed] [Jones'] standing in [the] case. (1) The same element in [the] prosecution which has caused a dilemma, i.e., that possession both convicts and confers standing, eliminates any necessity for a preliminary showing of an interest in the premises searched or the property seized, which ordinarily is required when standing is challenged. (2) Even were this not a prosecution turning on illicit possession, the legally requisite interest in the premises was . . . satisfied, for it need not be as extensive a property interest as was required by the courts below." Id., 263.

The court then stated that it would be contradictory and "not consonant with the amenities . . . of the administration of criminal justice"; id.; to hold that a defendant's refusal to acknowledge an interest in the items seized or the premises searched prevents him from challenging the search when the basis for his conviction is his possession of the same items. See id., 263–64. The court therefore concluded that "[t]he possession on the basis of which [Jones'] . . . was convicted suffice[d] to give him standing . . . ." Id., 264.

As a second, independent basis for the defendant's standing, the court held that "anyone legitimately on premises where a search occurs may challenge its legality by way of a motion to suppress, when its fruits are

proposed to be used against him." Id., 267. The court considered it "unnecessary and ill-advised to import into the law surrounding the constitutional right to be free from unreasonable searches and seizures subtle distinctions [such as those between lessee, licensee, invitee and guest], developed and refined by the common law in evolving the body of private property law . . . ." Id., 266. The court recognized, however, that its new standard "would of course not avail those who, by virtue of their wrongful presence, cannot invoke the privacy of the premises searched." Id., 267.

The United States Supreme Court reconsidered the "legitimately on the premises" rule in *Rakas* v. *Illinois*, supra, 439 U.S. 128. In that case, the defendants, Frank Rakas and Lonnie King, who were convicted of armed robbery, had sought to suppress guns that had been seized by the police during a search of an automobile in which they had been passengers. Id., 129–30. They claimed that there was no probable cause for the search. See id., 130–31. The Illinois Appellate Court concluded that the trial court properly had denied the defendants' motion to suppress on the ground that they lacked standing to object to the search. Id., 131–32.

On appeal to the United States Supreme Court, the defendants asserted that they had standing to challenge the search because they were its targets or, alternatively, because they were "legitimately on [the] premises . . . ." (Internal quotation marks omitted.) Id., 132. Relying heavily on its holding in *Alderman* v. *United States*, 394 U.S. 165, 174, 89 S. Ct. 961, 22 L. Ed. 2d 176 (1969), that "[f]ourth [a]mendment rights are personal rights which . . . may not be vicariously asserted"; *Rakas* v. *Illinois*, supra, 439 U.S. 133; the court rejected the defendants' "target" theory of standing. Id., 136–38. Having reaffirmed *Alderman*, the court further explained: "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging

evidence secured by a search of a third person's premises or property has not had any of his [f]ourth [a]mendment rights infringed. . . . And since the exclusionary rule is an attempt to effectuate the guarantees of the [f]ourth [a]mendment . . . it is proper to permit only defendants whose [f]ourth [a]mendment rights have been violated to benefit from the rule's protections. . . . There is no reason to think that a party whose rights have been infringed will not, if evidence is used against him, have ample motivation to move to suppress it. . . . Even if such a person is not a defendant in the action, he may be able to recover damages for the violation of his [f]ourth [a]mendment rights . . . or seek redress under state law for invasion of privacy or trespass." (Citations omitted.) Id., 134.

The court then asked "whether it serves any useful analytical purpose to consider [the] principle [that fourth amendment rights are personal] a matter of standing, distinct from the merits of a defendant's [f]ourth [a]mendment claim." Id., 138–39. The court answered this question in the negative, concluding that the "definition of [fourth amendment] rights is more properly placed within the purview of substantive [f]ourth [a]mendment law than within that of standing." Id., 140. The court further emphasized that the existence of a fourth amendment right depends on "whether the person who claims the protection of the [a]mendment has a legitimate expectation of privacy in the invaded place." Id., 143.

Turning to the defendants' claim under *Jones*, the court concluded that "the phrase 'legitimately on premises' . . . creates too broad a gauge for measurement of [f]ourth [a]mendment rights" because a person who is legitimately on the premises does not necessarily have a legitimate expectation of privacy in the premises. Id., 142. The court determined that the holding in *Jones* was "best . . . explained by the fact that Jones had a

legitimate expectation of privacy in the premises he was using . . . even though his 'interest' in those premises might not have been a recognized property interest at common law." Id., 143. Accordingly, the court disavowed the "legitimately on the premises" rule to the extent that it afforded standing to one who had no legitimate expectation of privacy in those premises. See id.

Because the defendants in *Rakas* had not been charged with possession of the seized guns, they had not invoked the "rule of 'automatic' standing [adopted in *Jones*] to contest an allegedly illegal search whe[n] the same possession needed to establish standing is an essential element of the offense charged . . . ." Id., 135. The court noted that it had "not yet had occasion to decide whether the automatic-standing rule of *Jones* survives [its] decision in *Simmons* v. *United States*, 390 U.S. 377 [394, 88 S. Ct. 967, 19 L. Ed. 2d 1247] (1968)," in which the court had concluded that a defendant's testimony to establish standing at a suppression hearing is not admissible at trial to establish guilt. *Rakas* v. *Illinois*, supra, 439 U.S. 135 n.4. The court in *Rakas* noted, however, that the automatic standing rule "is, of course, one which may allow a defendant to assert the [f]ourth [a]mendment rights of another." Id.

In *United States* v. *Salvucci*, supra, 448 U.S. 83, the court directly addressed the issue of whether the automatic standing rule of *Jones* was still viable in light of *Simmons*. In *Salvucci*, the defendants, John Salvucci and Joseph Zackular, were charged with unlawful possession of stolen mail. Id., 85. They sought to suppress the stolen items, which had been seized by the police during a search of an apartment owned by the mother of one of the defendants, on the ground that the search warrant was defective. See id. The District Court granted the motion to suppress, and the First Circuit Court of Appeals affirmed, concluding that the defen-

dants had automatic standing to raise the claim. Id., 85–86.

On appeal, the Supreme Court overruled the automatic standing rule established in *Jones*. Id., 85, 95. The court first addressed the "dilemma" that it had recognized in *Jones*, namely, that, with respect to a possessory offense, evidence deemed necessary to establish standing also constituted proof of the offense. (Internal quotation marks omitted.) Id., 89. The court concluded that the automatic standing rule was not necessary to relieve a defendant charged with possession of the seized items of the obligation of asserting his fourth amendment rights at the suppression hearing, at the risk of providing the government with incriminating evidence that would be admissible at trial, because, under *Simmons*, the government could no longer use that evidence against the defendant in its case-in-chief. Id., 89–90. The court then addressed "the question of whether the 'vice' of prosecutorial contradiction[21] could alone support a rule countenancing the exclusion of probative evidence on the [ground] that someone other than the defendant was denied a [f]ourth [a]mendment right." Id., 90. The court concluded that, in reaching that determination, the court in *Jones* "necessarily relied on the unexamined assumption that a defendant's possession of a seized good sufficient to establish criminal culpability was also sufficient to establish [f]ourth [a]mendment 'standing.' This assumption, however, even if correct at the time, [was] no longer so."[22] Id.

---

[21] As we have explained, the court in *Jones* concluded that it was contradictory for the government to argue that a defendant's refusal to acknowledge an interest in the items seized or the premises searched prevented him from challenging the search when the basis for his conviction was his possession of the same items. See *Jones* v. *United States*, supra, 362 U.S. 263–64.

[22] The court in *Simmons* had noted that "there will be occasions . . . when a defendant's testimony [regarding possession of the seized item] will be needed to establish standing"; *Simmons* v. *United States*, supra, 390 U.S. 390; but did not directly address the underlying assumption in *Jones* that proof of possession was *sufficient* to establish both standing and a reasonable expectation of privacy. The court appears simply to have assumed that

Rather, *Rakas* had made it clear that the right to challenge the legality of the search and seizure could be established "by asking not merely whether the defendant had a possessory interest in the items seized, but whether he had an expectation of privacy in the area searched." Id., 93.

Finally, the court in *Salvucci* addressed the defendants' claims that the automatic standing rule should be retained because *Simmons* did not prohibit the government from using testimony at a suppression hearing for the purpose of impeachment at trial; id.; and because it would "maximize the deterrence of illegal police conduct by permitting an expanded class of potential challengers." Id., 94. The court rejected the first claim because, even if it was assumed that the concern was valid, it would be more properly addressed by expanding the *Simmons* privilege. Id. It rejected the second claim because the societal costs of excluding evidence against a defendant that has been obtained in violation of another person's rights did not justify the incremental deterrent value. Id. The court also noted that the defendants' "deterrence argument carrie[d] no special force in the context of possessory offenses . . . ." Id., 94–95.

Thus, in concluding that a defendant seeking to suppress the fruits of an allegedly illegal search first must establish that his own fourth amendment rights were violated by demonstrating a legitimate expectation of

the automatic standing question necessarily involved the defendant's own fourth amendment rights, not those of another, and that a possessory interest in an item was sufficient to establish an expectation of privacy in the item. See id., 389 (fourth amendment rights are personal and may be enforced only by those whose own rights are infringed); id., 390 n.12 (noting argument that, under deterrent rationale for exclusionary rule, defendants should have standing "to object to the admission of any unconstitutionally seized evidence," but declining to address it because no such claim had been raised in that case). The court in *Rakas* had a different view. See *Rakas* v. *Illinois*, supra, 439 U.S. 135 n.4 (automatic standing rule of *Jones* allows defendant to assert fourth amendment rights of another).

privacy in the invaded premises; see id., 95; the court explained: "We are convinced that the automatic standing rule of *Jones* has outlived its usefulness in this [c]ourt's [f]ourth [a]mendment jurisprudence. The doctrine now serves only to afford a windfall to defendants whose [f]ourth [a]mendment rights have *not* been violated. We are unwilling to tolerate the exclusion of probative evidence under such circumstances since we adhere to the view of *Alderman* that the values of the [f]ourth [a]mendment are preserved by a rule which limits the availability of the exclusionary rule to defendants who have been subjected to a violation of their [f]ourth [a]mendment rights." (Emphasis in original.) Id.

This court's jurisprudence has tracked the development of the automatic standing doctrine in the United States Supreme Court. After *Jones* was decided, we applied the automatic standing rule in cases in which the defendant was charged with possession of the seized item. See, e.g., *State* v. *Perez*, 181 Conn. 299, 303–304, 435 A.2d 334 (1980) (defendant who was charged with larceny by receiving stolen property seized in warrantless search of automobile in which he was passenger had automatic standing to challenge search); *State* v. *Paoletto*, 181 Conn. 172, 177–78, 434 A.2d 954 (1980) (defendants who were charged with larceny by possession of items seized in allegedly pretextual stop of automobile in which they were passengers had automatic standing to challenge search); cf. *State* v. *McLucas*, 172 Conn. 542, 546–47, 375 A.2d 1014 (defendant who was not charged with possession of seized items, was not on premises at time of search and had no possessory interest in items lacked standing to challenge search under *Jones*), cert. denied, 434 U.S. 855, 98 S. Ct. 174, 54 L. Ed. 2d 126 (1977). After *Salvucci*, we concluded that, under the federal constitution, a defendant who was charged with a possessory offense

no longer had automatic standing to challenge an allegedly illegal search but was required to establish that he had a reasonable expectation of the privacy in the area searched. See, e.g., *State* v. *Hill*, supra, 237 Conn. 94–96 (defendant who was charged with possession of illegal drugs seized in warrantless search of apartment in which he had no reasonable expectation of privacy had no standing to challenge search); *State* v. *Altrui*, 188 Conn. 161, 178–79, 448 A.2d 837 (1982) (defendant who was charged with possession of weapons seized in warrantless search of automobile in which he had no reasonable expectation of privacy had no standing to challenge search); see also *State* v. *Maia*, 45 Conn. App. 679, 685, 697 A.2d 707 (rejecting claim that defendant who was charged with possession of illegal drugs was subject to illegal search when defendant had no reasonable expectation of privacy in apartment in which he was seized), cert. denied, 243 Conn. 242, 703 A.2d 98, cert. denied, 243 Conn. 941, 704 A.2d 797 (1997).

In *Hill*, the defendant, Maxime Hill, claimed that this court should adopt the automatic standing rule of *Jones* as a matter of state constitutional law. *State* v. *Hill*, supra, 237 Conn. 97 n.23. We declined to consider Hill's claim because he did not adequately raise or brief the issue. Id. In a dissenting opinion, Justice Norcott disagreed and argued that the court should address the issue. Id., 105. Similarly, in *State* v. *Maia*, 243 Conn. 242, 703 A.2d 98 (1997), an opinion in which we took the unusual step of explaining our decision to deny the petition for certification to appeal from the judgment of the Appellate Court in *State* v. *Maia*, supra, 45 Conn. App. 679, we concluded that, although the Appellate Court incorrectly determined that this court had rejected the automatic standing rule as a matter of state constitutional law in *State* v. *Altrui*, supra, 188 Conn. 161, *Maia* was not an appropriate case in which to address the issue.[23] See *State* v. *Maia*, supra, 243 Conn.

---

[23] In *Maia*, this court acknowledged that the issue of whether the state constitution embraces the principle of automatic standing is "an important

243. Justice Berdon, who characterized as "persuasive" the reasoning of those courts that had adopted the automatic standing rule, dissented from this court's decision to deny the defendant's petition for certification to appeal. Id., 243, 246. Thus, this court has not yet squarely addressed the issue of whether the state constitution embodies the automatic standing rule of *Jones*.

"It is well established that federal constitutional and statutory law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights. . . . Furthermore, although we often rely on the United States Supreme Court's interpretation of the amendments to the constitution of the United States to delineate the boundaries of the protections provided by the constitution of Connecticut, we have also recognized that, in some instances, our state constitution provides protections beyond those provided by the federal constitution, as that document has been interpreted by the United States Supreme Court." (Internal quotation marks omitted.) *State* v. *McKenzie-Adams*, 281 Conn. 486, 509, 915 A.2d 822 (2007). Indeed, this court has determined that, in certain respects, article first, § 7, of the state constitution affords greater protection than the fourth amendment to the United States constitution. E.g., *State* v. *Miller*, 227 Conn. 363, 377, 630 A.2d 1315 (1993) (article first, § 7, requires police to obtain warrant to search impounded automo-

one"; *State* v. *Maia*, supra, 243 Conn. 242; and that we ordinarily would have granted the petition for certification that had been filed by the defendant, Eric Maia, to consider whether Maia had automatic standing under the state constitution to contest an allegedly illegal search. Id., 242–43. We explained, however, that, under the facts presented, Maia would not be entitled to suppression of the fruits of the search "even if we [had] conclude[d] that the state constitution does, in fact, embody the doctrine of automatic standing." Id., 243. We therefore concluded that there was no reason to consider his claim under that doctrine. Id.

bile); *State* v. *Geisler*, 222 Conn. 672, 691–92, 610 A.2d 1225 (1992) (emergency exception to warrant requirement is narrower under article first, § 7, than under federal constitution); *State* v. *Marsala*, 216 Conn. 150, 171, 579 A.2d 58 (1990) (good faith exception to warrant requirement does not exist under article first, § 7, of state constitution); *State* v. *Dukes*, 209 Conn. 98, 120–21, 547 A.2d 10 (1988) (search incident to arrest exception to warrant requirement is narrower under article first, § 7, than under federal constitution). In determining the scope of the rights secured by our state constitution, "the following tools of analysis should be considered to the extent applicable: (1) the [text of the constitutional provision] . . . (2) holdings and dicta of this court . . . (3) federal precedent . . . (4) sister state decisions . . . (5) the [history of the constitutional provision] . . . including the historical constitutional setting and the debates of the framers . . . and (6) economic/sociological considerations." (Citations omitted.) *State* v. *Geisler*, supra, 684–85. The defendant claims that these factors collectively support the conclusion that article first, § 7, embodies the automatic standing rule of *Jones*. We address each factor in turn.

With respect to the first *Geisler* factor, namely, the text of the state constitutional provision and differences between that text and the text of the relevant federal constitutional provision, this court repeatedly has observed that the language of article first, § 7, of the state constitution closely resembles the language of the fourth amendment to the federal constitution. E.g., *State* v. *Mikolinski*, 256 Conn. 543, 548, 775 A.2d 274 (2001); *State* v. *Miller*, supra, 227 Conn. 381; *State* v. *Barton*, 219 Conn. 529, 540, 594 A.2d 917 (1991). That linguistic similarity undermines the defendant's contention that the state constitution provides a greater opportunity to challenge the legality of a search than the federal constitution. The similarity denotes "a common

source[24] and, thus, [supports] a common interpretation of the provisions." (Internal quotation marks omitted.) *State* v. *McKenzie-Adams,* supra, 281 Conn. 511. Further support for such a common interpretation is the fact that the language of article first, § 7, was adopted with little debate. *State* v. *Mikolinski,* supra, 548.

The defendant notes, however, that the text of article first, § 7, protects the right of the people to be secure in their "possessions," whereas the fourth amendment to the federal constitution protects the right of the people to be secure in their "effects." He contends that the word "possessions" is broader than "effects" because it includes items over which the defendant has control, whereas "effects" includes only items that the defendant owns. In support of his claim, the defendant relies on several cases of this court that, he asserts, draw such a distinction between "effects" and "possessions," albeit implicitly. See, e.g., *State* v. *Weinberg,* 215 Conn. 231, 255, 575 A.2d 1003, cert. denied, 498 U.S. 967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990); *Seigel* v. *Heimovitch,* 128 Conn. 543, 548, 24 A.2d 481 (1942); *Parker, Peebles & Knox* v. *El Saieh,* 107 Conn. 545, 551, 141 A. 884 (1928). We disagree with the defendant's textual argument for several reasons.

First, we are not persuaded that the word "effects," which is defined as "movable property" or "goods"; Webster's Third New International Dictionary;[25] necessarily connotes an ownership interest in that property, or that it otherwise has a materially different meaning than the term "possessions." In other words, we do not

[24] "The declaration of rights adopted in 1818 appears to have its antecedents in the Mississippi constitution of 1817, which in turn derived from the federal bill of rights and the Virginia declaration of rights of 1776." (Internal quotation marks omitted.) *State* v. *McKenzie-Adams,* supra, 281 Conn. 511 n.14.

[25] The defendant does not suggest that the meaning of the word "effects" is different today than it was when the fourth amendment was ratified.

perceive any meaningful distinction between "effects" and "possessions." Indeed, in *People* v. *Smith*, 420 Mich. 1, 360 N.W.2d 841 (1984), the Supreme Court of Michigan addressed a claim that article I, § 11, of the Michigan constitution, which, like article first, § 7, of our state constitution, protects against unreasonable searches and seizures of "[t]he person, houses, papers and *possessions* of every person";[26] (emphasis added) Mich. Const., art. I, § 11; afforded the defendant in that case automatic standing to challenge the legality of a search because the term "possessions" is broader than the term "effects." In rejecting the claim, the Michigan Supreme Court explained that "[t]he terms 'possessions' and 'effects' are virtually identical in meaning and are often used interchangeably." *People* v. *Smith*, supra, 20. We agree that any difference in the meaning of the word "possessions" and the meaning of the word "effects" is inconsequential for purposes of determining the right of a defendant to challenge an allegedly illegal search.[27]

Furthermore, the cases on which the defendant relies do not support the proposition that this court impliedly has recognized that the term "effects," in contrast to the term "possessions," denotes an ownership interest; although those cases use both words, they do not purport to define them, either explicitly or implicitly. Finally, the defendant points to nothing in the history or genealogy of article first, § 7, to indicate that the

---

[26] Article I, § 11, of the Michigan constitution provides in relevant part: "The person, houses, papers and possessions of every person shall be secure from unreasonable searches and seizures. No warrant to search any place or to seize any person or things shall issue without describing them, nor without probable cause, supported by oath or affirmation. . . ."

[27] We note that, in *State* v. *DeFusco*, 224 Conn. 627, 620 A.2d 746 (1993), the state claimed that, "because the fourth amendment protects, inter alia, 'effects,' whereas [article first] § 7 protects, inter alia, the *narrower* category of 'possessions,' the state constitution cannot be interpreted to provide more protection than . . . the federal constitution." (Emphasis added.) Id., 634–35. We declined to address the state's claim, however, because the state raised it for the first time at oral argument. Id.

framers of our constitution, by virtue of their use of the word "possessions" instead of the word "effects," sought to provide a greater measure of protection under that state constitutional provision than under the fourth amendment.

Even if the defendant's textual analysis were correct, however, it would not advance the defendant's claim. The decision of the United States Supreme Court in *United States* v. *Salvucci,* supra, 448 U.S. 83, in which that court overruled the automatic standing doctrine, did not turn on whether the defendant owned the seized items or merely possessed them. Indeed, the court expressly stated that "property rights are neither the beginning nor the end of th[e] [c]ourt's inquiry" into whether a defendant's fourth amendment rights have been violated by an illegal search. Id., 91. Rather, the court concluded that the dispositive question is whether the search violates "a legitimate expectation of privacy in the invaded place." (Internal quotation marks omitted.) Id., 91–92.

To be sure, in *State* v. *Wood,* 148 Vt. 479, 489, 536 A.2d 902 (1987), the Vermont Supreme Court concluded that, because the Vermont constitution, which refers to "possessions," protects possessory interests, that constitution embodies the automatic standing rule. In support of this conclusion, however, the court relied on the decision of the New Jersey Supreme Court in *State* v. *Alston,* supra, 88 N.J. 211, in which that court, after noting that paragraph seven of article I of the New Jersey constitution, which "is taken almost verbatim from the [f]ourth [a]mendment"; id., 225; refers to "the right of the people to be secure in their persons, houses, papers *and effects*"; (emphasis in original; internal quotation marks omitted) id., 226–27; concluded that the New Jersey constitution reflected an intent to protect possessory interests and therefore embodied the automatic standing rule. Id., 228. It is apparent, therefore,

that the use of the word "possessions" instead of the word "effects" has little, if any, significance in the present context. Accordingly, we conclude that the text of the state constitution does not support the defendant's claim.

The second factor, holdings and dicta of this court, also does not aid the defendant. Although the defendant correctly notes that this court has held that, under certain circumstances, the protections afforded under article first, § 7, of the state constitution are broader than those afforded by the federal constitution, he has identified no decision in which a majority of this court has suggested that adoption of the automatic standing doctrine may be required to protect the privacy expectations of Connecticut's citizens. As we have indicated, this court expressly has left that question open. See *State* v. *Maia*, supra, 243 Conn. 242. This court has held, however, that, in determining whether article first, § 7, has been violated, "we employ the same analytical framework that would be used under the federal constitution." *State* v. *Joyce*, 229 Conn. 10, 18, 639 A.2d 1007 (1994); see also, e.g., *State* v. *DeFusco*, 224 Conn. 627, 633, 620 A.2d 746 (1993). Specifically, we ask whether the defendant has established that he had a reasonable expectation of privacy in the area or thing searched.[28] See, e.g., *State* v. *DeFusco*, supra, 633. Our use of this test for purposes of article first, § 7, of the state constitution lends support for the proposition that, because the rights protected under that state constitutional provision, like the rights protected under the fourth amendment, are personal, they may not be asserted vicariously. As we stated in *State* v. *Gonzalez*, 278 Conn.

---

[28] Of course, "our adoption of an analytical framework or methodology used under the federal constitution does not compel this court to reach the same outcome that a federal court might reach when the methodology is applied to a particular set of factual circumstances." *State* v. *Joyce*, supra, 229 Conn. 18 n.12.

341, 898 A.2d 149 (2006), "[f]ourth [a]mendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted. . . . A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his [f]ourth [a]mendment rights infringed. . . . And since the exclusionary rule is an attempt to effectuate the guarantees of the [f]ourth [a]mendment . . . it is proper to permit only defendants whose [f]ourth [a]mendment rights have been violated to benefit from the rule's protections. . . . Consequently, the [United States] Supreme Court has long held that a reasonable expectation of privacy in the subject of a search is a prerequisite for fourth amendment protection." (Citation omitted; internal quotation marks omitted.) Id., 348–49.

In its amicus brief, however, the association contends that this court has "expressed a tincture of criticism of hinging suppression review solely on 'standing' related to privacy interests." In support of this claim, the association relies on the following language in *State* v. *Conger*, 183 Conn. 386, 439 A.2d 381 (1981): "The . . . case illustrates a potential weakness of viewing as a matter of 'standing' the principle that 'rights assured by the [f]ourth [a]mendment are personal rights, [which] . . . may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure.' *Rakas* v. *Illinois*, [supra, 439 U.S. 138] . . . . The preferred analysis dispenses with the distinct 'standing' question. Instead, the issue becomes 'whether the challenged search or seizure violated the [f]ourth [a]mendment rights of a criminal defendant who seeks to exclude the evidence obtained during it.' [Id., 140]." (Citation omitted.) *State* v. *Conger*, supra, 390 n.5. The association appears to suggest that this language reflects the court's favorable view of the

automatic standing rule. See *State* v. *Maia,* supra, 243 Conn. 247 (*Berdon, J.,* dissenting) ("even after [*Rakas*] and [*Salvucci*], this court questioned the wisdom of abandoning the automatic standing doctrine in . . . *Conger*").

We disagree with this reading of *Conger.* The defendant in that case, John Conger, had challenged the legality of a police stop of the truck that he was driving, which he had stolen. *State* v. *Conger,* supra, 183 Conn. 387–89. In the language cited by the association, we merely indicated that, under *Rakas,* the question of whether the defendant had standing to challenge the search had merged with the question of whether the defendant's fourth amendment rights had been violated by the alleged illegal conduct, and the latter question could not be answered by the mechanical application of a rule *denying* standing merely because the defendant *lacked* a property interest in the area searched. Because the trial court in *Conger* had failed to consider whether Conger, "as an occupant of the truck, ha[d] an interest in continuing his travels without government intrusion" that possibly gave rise to a protectible fourth amendment right; id., 391; we concluded that the court improperly had denied Conger's motion to suppress, and, therefore, we remanded the case for consideration of that question. Id., 394. *Conger* does not stand for the proposition that, if a defendant fails to establish a privacy right in the premises or the thing searched, then a mere possessory interest in the item seized would allow him to challenge the search and seizure.

As we have indicated, the third *Geisler* factor, federal precedent, clearly favors the state. The United States Supreme Court held unequivocally in *Salvucci* that, under the fourth amendment, a defendant does not have automatic standing to challenge a search merely by virtue of having a possessory interest in the item seized. *United States* v. *Salvucci,* supra, 448 U.S. 85, 95. Rather,

"defendants charged with crimes of possession may only claim the benefits of the exclusionary rule if their own [f]ourth [a]mendment rights have . . . been violated." Id., 85. In other words, a defendant may not invoke the fourth amendment to challenge the legality of a search unless he first can establish a legitimate expectation of privacy in the area searched. Id., 93.

The fourth factor, sister state decisions, also favors the state. The defendant notes that several states have adopted the automatic standing rule as a matter of state constitutional law. *Commonwealth* v. *Amendola*, 406 Mass. 592, 599, 550 N.E.2d 121 (1990); *State* v. *Bullock*, 272 Mont. 361, 372–73, 901 P.2d 61 (1995); *State* v. *Settle*, 122 N.H. 214, 218, 447 A.2d 1284 (1982); *State* v. *Alston*, supra, 88 N.J. 228; *Commonwealth* v. *Sell*, 504 Pa. 46, 67–68, 470 A.2d 457 (1983); *State* v. *Wood*, supra, 148 Vt. 489; *State* v. *Simpson*, 95 Wash. 2d 170, 180–81, 622 P.2d 1199 (1980); see also *State* v. *Culotta*, 343 So. 2d 977, 981 (La. 1976) (article first, § 5, of Louisiana constitution affords defendants automatic standing to challenge illegal searches and seizures). The decision of the Supreme Court of New Jersey in *Alston* is representative of the foregoing cases. The New Jersey court concluded that, contrary to the United States Supreme Court's statement in *Salvucci* that a mere possessory interest does not create a legitimate expectation of privacy, "a person's ownership of or possessory interest in personal property seized by law enforcement officials is quite sufficient to confer standing to claim that personal [f]ourth [a]mendment privacy rights have been violated."[29] *State* v. *Alston*, supra, 227. The court also concluded that "it serves the purposes of clarity to emphasize an accused's relationship to *property* rather

---

[29] The court in *Alston* did not appear to limit the automatic standing rule to cases in which the defendant is charged with a possessory offense. See *State* v. *Alston*, supra, 88 N.J. 227–28; see also *Commonwealth* v. *Sell*, supra, 504 Pa. 67–68; *State* v. *Wood*, supra, 148 Vt. 489.

than to attempt a definition of expectations in terms of the person. Therefore, rather than follow the amorphous 'legitimate expectations of privacy in the area searched' standard . . . [the court] retain[s] the rule of standing traditionally applied in New Jersey, namely, that a criminal defendant is entitled to bring a motion to suppress evidence obtained in an unlawful search and seizure if he has a proprietary, possessory or participatory interest in either the place searched or the property seized." (Emphasis in original.) Id., 227–28; see also *State* v. *Settle*, supra, 219–20 (possessory interest standard is simpler and more easily applied than legitimate expectation of privacy test); *State* v. *Wood*, supra, 490 (same).

The majority of states that have considered the issue, however, have expressly rejected the automatic standing rule as a matter of state constitutional law and followed the holding of *Salvucci* that a defendant may challenge the legality of a search only if he had a reasonable expectation of privacy in the subject of the search. E.g., *State* v. *Juarez*, 203 Ariz. 441, 447, 55 P.3d 784 (App. 2002), review denied, No. CR-02-0378-PR, 2003 Ariz. LEXIS 20 (Ariz. February 11, 2003); *State* v. *Hutchinson*, 404 So. 2d 361, 364 (Fla. App. 1981), cert. denied, 412 So. 2d 466 (Fla. 1982); *State* v. *Tau'a*, 98 Haw. 426, 439, 49 P.3d 1227 (2002); *Livingston* v. *State*, 542 N.E.2d 192, 194 (Ind. 1989); *Gahan* v. *State*, 290 Md. 310, 322, 430 A.2d 49 (1981); *People* v. *Smith*, supra, 420 Mich. 25–26; *State* v. *McCrary*, 621 S.W.2d 266, 273 (Mo. 1981); *People* v. *Ponder*, 54 N.Y.2d 160, 165, 429 N.E.2d 57, 445 N.Y.S.2d 57 (1981); *State* v. *Lind*, 322 N.W.2d 826, 833 (N.D. 1982); *State* v. *Wilson*, 678 N.W.2d 176, 185–86 (S.D. 2004); *State* v. *Callaway*, 106 Wis. 2d 503, 520, 317 N.W.2d 428, cert. denied, 459 U.S. 967, 103 S. Ct. 294, 74 L. Ed. 2d 277 (1982). The decision of the Supreme Court of Hawaii in *State* v. *Tau'a*, supra, 426, is representative of these cases. That court concluded that "[t]he

exclusionary rule protects only those defendants whose *own* constitutional rights have been violated; there is no compelling reason to make an exception for defendants charged with possessory offenses. . . . [A] mere possessory interest in a seized item does not necessarily mean that the possessor's reasonable expectation of privacy has been infringed. . . . For example, a defendant who leaves evidence in a place readily accessible to the public may retain an ownership interest in his or her possessions, but he or she certainly does not retain any reasonable interest in the privacy of the evidence. Consequently, a possessory or ownership interest in a thing cannot serve as a substitute for a determination that a defendant's own reasonable and constitutionally protected expectation of privacy in the thing has been abused." (Citation omitted; emphasis in original; internal quotation marks omitted.) Id., 438.

The court in *Tau'a* also observed that "allowing a defendant charged with a possessory offense to avail himself or herself of the exclusionary rule as a function of the violation of a third party's constitutional rights would produce absurd results. An automobile thief, for example, would be in a position to assert the constitutional rights of the true owner of the automobile as a predicate for the suppression of evidence seized therein." Id., 438–39. The Hawaii Supreme Court also agreed with the conclusion of the United States Supreme Court in *Salvucci* that *Simmons* had eliminated the "self-incrimination dilemma . . . ." (Internal quotation marks omitted.) Id., 439. The court explained that, "[a]lthough *Simmons* did not specifically address whether a defendant's testimony given at a suppression hearing may be used for impeachment purposes at trial, [the court did] not believe that such a possibility justifie[d] the 'automatic standing' rule." Id. Finally, the court noted that "[i]t is one thing to protect a defendant from the dilemma of having to testify that there was

possession to obtain standing at the cost of having that testimony used to incriminate him at trial. It is an entirely different proposition to give [the] defendant protection against exposure of his lying at trial by denying the use of his suppression motion testimony." (Internal quotation marks omitted.) Id.

With respect to the fifth *Geisler* factor, historical considerations, neither the parties nor amici have pointed to anything in the history of article first, § 7, of the state constitution that either supports or militates against the automatic standing rule. Although the absence of any such historical evidence ordinarily would lead to the conclusion that this factor favors neither the state nor the defendant, as we previously have indicated, article first, § 7, is nearly identical to the fourth amendment, after which it was modeled. It also appears that article first, § 7, was adopted without extensive debate. *State* v. *Mikolinski*, supra, 256 Conn. 548. In such circumstances, it reasonably may be argued that the lack of any evidence indicating that article first, § 7, was intended to be more broadly protective of privacy rights than the fourth amendment gives rise to a contrary inference.

Finally, we conclude that the sixth *Geisler* factor, namely, policy and sociological considerations, favors the state. The defendant argues that justice requires that the use of illegally seized evidence in a criminal trial should be barred, regardless of whether the defendant's privacy rights have been infringed. Closely related to this argument is his contention that the automatic standing rule is required to deter illegal police conduct. In response, the state, quoting *Rakas* v. *Illinois*, supra, 439 U.S. 137, notes that " '[e]ach time the exclusionary rule is applied it exacts a substantial social cost for the vindication of [fourth amendment] rights' because '[r]elevant [and reliable] evidence is kept from the trier of fact and the search for truth at trial is deflected.' "

We find the state's argument more compelling. Although this court has recognized that the citizens of this state may have broader expectations of privacy than are recognized under the federal constitution, we are not convinced that our citizens should bear the cost of the exclusionary rule when a criminal defendant's own rights, gauged by his own legitimate privacy expectations, have not been violated. We adhere to the view, rather, that the interests of our citizenry are best served by an exacting application of the exclusionary rule when the accused has established a violation of his constitutionally protected privacy rights.

We also do not believe that the automatic standing rule is necessary to deter police misconduct. Police already have a strong incentive to comply with constitutional requirements, lest otherwise valid cases could be lost. There also is no indication of a proliferation of illegal searches and seizures in the nearly thirty years since the automatic standing rule was abolished for purposes of the fourth amendment. Furthermore, there is little reason to think that the police will initiate unlawful searches against suspects who the police believe will be unable to challenge the legality of the search for lack of a reasonable expectation of privacy in the area or object searched. In view of the complexities and exigencies of modern day law enforcement, it is unlikely that police will risk losing important evidence by attempting to predict that the target of their investigation will be unable to seek to suppress that evidence as the fruit of an illegal search.

Furthermore, the defendant's "deterrence argument carries no special force in the context of possessory offenses"; *United States* v. *Salvucci*, supra, 448 U.S. 94–95; to which the application of the automatic standing rule is limited. If deterrence were the primary policy basis for the exclusionary rule, then, logically, evidence would be excluded *whenever* a search violated a third

person's rights.[30] As we have indicated, this court consistently has held that the touchstone in determining whether article first, § 7, of the state constitution has been violated is whether the search violated the reasonable privacy expectations of the *defendant.* See, e.g., *State* v. *Joyce,* supra, 229 Conn. 20; *State* v. *DeFusco,* supra, 224 Conn. 633.

The defendant also suggests that "the publicized recognition about the disproportionate impact of present policing policies on people of color, and the increasing acknowledgement that many are wrongly convicted, [should] compel the courts to examine the basis for the search and seizure in every case." S. Zeidman, "Policing the Police: The Role of the Courts and the Prosecution," 32 Fordham Urb. L.J. 315, 333 (2005); see also *State* v. *Hill,* supra, 237 Conn. 113 (*Norcott, J.,* dissenting) (expressing concern that "the people in less than affluent, urban neighborhoods of this state, where a higher population density provides for different patterns of comings and goings than in their suburban counterparts, are being and will continue to be subjected, on the basis of equivocal evidence, not only to invasive, unreasonable police conduct, but also to the lack of a meaningful, effective opportunity to remedy and deter that conduct"); see also id., 107 n.1 (*Norcott, J.,* dissenting) ("[u]nder the automatic standing [rule], houseguests and casual visitors arguably would have

---

[30] We note that at least one state court has adopted this standard for purposes of the fourth amendment. See *People* v. *Martin,* 45 Cal. 2d 755, 761, 290 P.2d 855 (1955) ("[s]ince all of the reasons that compelled [the court] to adopt the exclusionary rule are applicable whenever evidence is obtained in violation of constitutional guarantees, such evidence is inadmissible whether or not it was obtained in violation of the particular defendant's constitutional rights"). This rule of "universal standing" was overruled as a matter of federal law by *Alderman* v. *United States,* supra, 394 U.S. 174, and was superseded as a matter of California law by an amendment to the California state constitution in 1982. See *In re Lance W.,* 37 Cal. 3d 873, 879, 886–87, 694 P.2d 774, 210 Cal. Rptr. 631 (1985). The defendant in the present case has not requested that we adopt this rule.

the right to claim the protection of the exclusionary rule under the state constitution").

With respect to the defendant's argument pertaining to wrongful convictions, we cannot perceive how excluding relevant and reliable evidence in which the defendant has a possessory interest, but no legitimate expectation of privacy, would enhance the truth seeking function of criminal proceedings. We also are not persuaded by the points raised in the dissenting opinion in *Hill*. First, if we assume that the urban conditions to which he refers, such as the existence of multiple family residences and apartment buildings with easily accessible common areas, make invasive, unreasonable police conduct more likely, then we also may assume that these conditions make it more likely that private persons will be able to intrude into common areas where they have no right to be, including criminals seeking concealed places to conduct their business and to evade the police. See *State* v. *Maia*, supra, 45 Conn. App. 681 (defendant who was in possession of drugs ran into common area of residential building where he did not live and had no reason to be except to evade police). Affording automatic standing to persons who have no right to be in the area searched would tend to deprive the persons who live in such areas of their right to protection from such criminal activity. Indeed, city dwellers are entitled to no less recognition and protection of their right to be free from unwarranted intrusions into their privacy than persons living in what may be characterized as more affluent areas.

In addition, the automatic standing rule is not necessary to protect the privacy interests of persons located in the common areas of buildings, or of urban houseguests, visitors and other persons who have fluid living arrangements and exhibit "different patterns of comings and goings than . . . their suburban counterparts . . . ." *State* v. *Hill*, supra, 237 Conn. 113 (*Nor-*

*cott, J.,* dissenting). The defendant's reasons for being where he was and his specific living pattern must be considered in determining whether he had a reasonable expectation of privacy in the invaded area under both the federal and state constitutions, and, as we have indicated, this court has been willing to recognize a broader right to privacy under the state constitution. See, e.g., *State* v. *Miller,* supra, 227 Conn. 377; *State* v. *Geisler,* supra, 222 Conn. 691–92; *State* v. *Marsala,* supra, 216 Conn. 171; *State* v. *Dukes,* supra, 209 Conn. 120–21. In any event, none of these arguments has any special relevance to possessory offenses, to which the automatic standing rule is limited in its application.

Considering all of the *Geisler* factors, we conclude that article first, § 7, of the state constitution does not embody the automatic standing doctrine. To the extent that the court in *Jones* concluded that a mere possessory interest in a seized item, without more, gives rise to a reasonable expectation of privacy in the item, we agree with the court in *Salvucci* that any such assumption was unfounded. *United States* v. *Salvucci,* supra, 448 U.S. 90. A contrary conclusion would lead to the absurd result that the seizure of an item in plain view in a publicly accessible area must be treated as illegal with respect to a person with an ownership or possessory interest in that item.[31] See *State* v. *Tau'a,* supra, 98 Haw. 438.

---

[31] The *seizure* of an item in plain view in a public place may itself be challenged even in the absence of an illegal search, if the police lacked any lawful ground for the seizure. See *United States* v. *Lisk,* 522 F.2d 228, 230–31 (7th Cir. 1975), cert. denied, 423 U.S. 1078, 96 S. Ct. 865, 47 L. Ed. 2d 89 (1976). The defendant in the present case has raised no such claim.

We also recognize that, under certain circumstances, a defendant may have a privacy right in a *closed container* in plain view in a secluded, public place. See *State* v. *Mooney,* 218 Conn. 85, 98–99, 588 A.2d 145, cert. denied, 502 U.S. 919, 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991). A mere possessory interest in the container, however, does not give rise to such a right. See id., 100–101 (issue to be resolved was "whether the fourth amendment applie[d] to the unique factual circumstances of th[e] case, where the closed containers were found by the police in a secluded place that they knew the

This basic flaw in the automatic standing rule also undermines its application to factual scenarios in which the search may have been illegal as to *someone*. Because there would be no need for a defendant to invoke the rule if he were able to establish that he had a reasonable expectation of privacy in the area or thing searched; see *State* v. *Kypreos*, 110 Wash. App. 612, 622, 39 P.3d 371 (2002) (if defendant were able to establish reasonable expectation of privacy, invocation of automatic standing doctrine would be "completely unnecessary"); the rule effectively allows the defendant to raise the rights of a third party. *United States* v. *Salvucci*, supra, 448 U.S. 90 (automatic standing rule contemplates "the exclusion of probative evidence on the grounds that someone other than the defendant was denied a [f]ourth [a]mendment right"); *Rakas* v. *Illinois*, supra, 439 U.S. 135 n.4 (automatic standing rule allows defendant to raise "[f]ourth [a]mendment rights of another"). Indeed, that third party may be a purely hypothetical one.[32] See *State* v. *Tau'a*, supra, 98 Haw. 439 (automatic standing rule would allow defendant to raise rights of possibly hypothetical third party).

In such cases, the sole justification for applying the automatic standing rule is to deter and punish unlawful

defendant regarded as his home, where the defendant's absence from that place at the time of the search was due to his arrest and custody by the police, and where the purpose of the search was to obtain evidence of the crimes for which he was in custody"). We again underscore that the defendant in the present case does not challenge the trial court's determination that he had no reasonable expectation of privacy in the black duffle bag. He claims, rather, that the trial court could have found that he legitimately was on the invaded premises.

[32] This possibility is demonstrated by the facts of the present case, in which the defendant claims neither that he had a reasonable expectation of privacy in the premises or duffle bag nor that the police violated Cook's reasonable expectation of privacy. Rather, his claim appears to be premised on the theory that, if some hypothetical person had a reasonable expectation of privacy in the apartment or duffle bag requiring the police to obtain his consent to the search, then that person's fourth amendment rights would have been violated by the search.

police conduct. As we have indicated, however, that justification has no special force with respect to possessory offenses, and our jurisprudence generally does not support the contention that the state constitution extends the protection of the exclusionary rule to a defendant whenever a search violates *anyone's* privacy rights. Moreover, we agree with the following statement by the United States Supreme Court in *Alderman* v. *United States*, supra, 394 U.S. 165: "The deterrent values of preventing the incrimination of those whose rights the police have violated have been considered sufficient to justify the suppression of probative evidence even though the case against the defendant is weakened or destroyed. We adhere to that judgment. But [the court is] not convinced that the additional benefits of extending the exclusionary rule to other defendants would justify further encroachment [on] the public interest in prosecuting those accused of crime and having them acquitted or convicted on the basis of all the evidence which exposes the truth." Id., 174–75.

To the extent that the automatic standing doctrine was intended to act as a proxy for a traditional expectation of privacy analysis when the defendant's testimony at a suppression hearing would be self-incriminating, we agree with the court in *Salvucci* that *Simmons* v. *United States*, supra, 390 U.S. 394, has eliminated this dilemma. *United States* v. *Salvucci*, supra, 448 U.S. 89. We further conclude that the potential use of such testimony for impeachment purposes at trial does not raise the same concerns as its use to establish the defendant's guilt. See *State* v. *Tau'a*, supra, 98 Haw. 439. Moreover, even if the concern over the use of such testimony for impeachment were valid, it would be more properly addressed by modifying the scope of the *Simmons* rule; see *United States* v. *Salvucci*, supra, 94; which this court would be free to do, if appropriate, for purposes of the state constitution.

Finally, we address the association's contention that we should adopt the automatic standing rule because the reasonable expectation of privacy analysis "requires all courts in this state to engage in the nearly clairvoyant task of delving into the subjective inner workings of individual defendants' minds, to determine what they thought or believed, before deciding whether such thought processes were reasonable or acceptable to society in general." The association further maintains that "[p]roviding to a broader spectrum of individuals the automatic right to challenge the legality of the seizure of items . . . will allow the courts to decide the parameters of the constitutional right of citizens to be free from unreasonable searches and seizures . . . without first engaging in increasingly technical fact-finding about the nature of privacy in the twenty-first century." On balance, we do not find these arguments persuasive. As we have indicated, eliminating the requirement that the defendant establish a reasonable expectation of privacy in the searched area would either (1) result in the suppression of evidence when *no one's* privacy rights have been violated, an outcome which strikes us as both counterintuitive and unwarranted, or (2) merely shift the focus of the privacy determination from the defendant to a third party, a task that would be no less demanding on the courts. Although the "reasonable expectation of privacy" test sometimes may not be easy to apply, we believe that it is an indispensable part of any analysis under article first, § 7, of the state constitution. Cf. *Rakas* v. *Illinois*, supra, 439 U.S. 152 (Powell, J., concurring) ("[w]hatever the application of [the reasonable expectation of privacy] standard may lack in ready administration, it is . . . faithful to the purposes of the [f]ourth [a]mendment").

In addition, this state's courts have had significant experience in applying the "reasonable expectation of privacy" standard under the fourth amendment. Noth-

ing in that experience suggests that our courts are not up to the task. Although the test "offers no exact template that can be mechanically imposed upon a set of facts to determine whether or not standing is warranted . . . [i]t does . . . provide the normal common-law value of general direction and practical flexibility." *People* v. *Smith*, supra, 420 Mich. 26. We see no reason to eschew the test for state constitutional purposes merely because its "parameters . . . are not [always] delimited by a fine line." Id.

The foregoing analysis also persuades us that article first, § 7, of our state constitution does not embody the "legitimately on the premises" rule of standing. We again emphasize that all of our cases defining the scope of the right secured by article first, § 7, focus on the defendant's reasonable expectation of privacy. We recognize that "a person can have a legally sufficient interest in a place other than his own home so that the [constitution] protects him from unreasonable governmental intrusion into that place." *Rakas* v. *Illinois*, supra, 439 U.S. 142. Moreover, "arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like, ought not to control." Id., 143. As the United States Supreme Court observed when presented with the same argument under the federal constitution, however, "the phrase 'legitimately on premises' . . . creates too broad a gauge for [the] measurement" of privacy rights under the constitution. Id., 142. Although a person who can establish that he was legitimately on another person's property may be able to establish a protectible privacy interest; see, e.g., *Minnesota* v. *Olsen*, 495 U.S. 91, 97–98, 110 S. Ct. 1684, 109 L. Ed. 2d 85 (1990); that determination is the beginning, not the end, of a privacy analysis. We conclude, therefore, that the trial court in the present case properly denied the defendant's motion to suppress the evidence seized as a result of the search of the black duffle bag.

## II

We next address the defendant's claim that the evidence was insufficient to sustain his conviction. Specifically, the defendant contends that the evidence was insufficient to establish his identity as the shooter. We disagree.

The following additional facts and procedural history are relevant to our resolution of this claim. Tanika Davis,[33] a bartender at the club, testified that three or four of Joseph Ellis' friends "jumped" the defendant in the club parking lot on October 3, 1999, approximately six weeks before the shooting. They knocked him to the ground and punched him for several minutes. Ellis was in the parking lot at the time, but Tanika Davis could not remember whether Ellis and the defendant fought. After the fight, the defendant was upset that no one had come to his aid.

Elizabeth Lopes testified that Ricky Gomez was sleeping at her apartment on the night of October 3, 1999. Some time after midnight, on October 4, 1999, the defendant came to the apartment and woke Ricky Gomez. Both of them went outside. Lopes looked out the window and could see that the defendant was upset and was banging his hands on a car. Ricky Gomez then left with the defendant. When Ricky Gomez returned to the apartment later that day, he told Lopes that the defendant had been "jumped," that Ricky Gomez' sister, Melissa Gomez, had attempted to help the defendant and that, while doing so, she had injured her knees. Ricky Gomez was angry and said that he was going to "kill" the persons who had injured his sister.

Clayton Ballinger testified that, on November 13, 1999, Ricky Gomez visited him at his apartment and that they smoked marijuana together. Later that day,

---

[33] Tanika Davis is not related to the defendant.

Ricky Gomez left the apartment and Ballinger went out. As Ballinger returned home, he saw Melvin Jones in a park located next to his apartment. Ballinger bought a .22 caliber revolver from Jones and test fired it in his backyard. Still later in the day, Ballinger went to the club with his cousin, Michael Dawkins, and brought the gun with him for protection. He hid the gun in some bushes in front of the club and went into the club's poolroom. Some time later, the defendant, Ricky Gomez, Ron Pires and Yolanda Pires came into the room. The defendant went to the service window to get a drink and saw Jermaine Floyd in the bar area. The defendant then became angry and went into the bathroom. Ballinger followed the defendant and saw him in a toilet stall, where he "was about to put [a tee shirt on his face] but then . . . put it down." Ballinger told the defendant to "let it go" and then left the bathroom. Several minutes later, he went back inside to check on the defendant. Ballinger asked the defendant if he was all right, and the defendant responded that he was. Ballinger then left the bathroom and went outside, where he saw Ron Pires, Yolanda Pires and Ricky Gomez get into a car and drive away from the club. Five or ten minutes later, while Ballinger was standing right outside the club, he heard four or five gunshots from inside the club. Ballinger then retrieved the gun that he had hidden under the bushes and ran back into the club to find his sister and two sisters-in-law. He saw Joseph Dubose and Ellis lying on the floor. After Ballinger located his sister and his sisters-in-law, all of them went to Ballinger's apartment.

Shortly after 4 a.m. on November 14, 1999, Norwich police detectives went to Ballinger's apartment and asked him to come with them to the police station. Once there, they questioned him about the shooting. They asked about Ricky Gomez' involvement, and Ballinger told them that he had not seen Ricky Gomez at

the club. The police did not ask Ballinger about the defendant. Ballinger testified that he did not tell the police the truth about the events at the club because he was afraid of Ricky Gomez and the defendant. Ballinger told the police that he had fired a gun earlier that night and gave them permission to perform a gun powder residue test on his hands and on the clothing that he had been wearing. The tests were negative.

Several days later, Ballinger visited his probation officer in Norwich city hall. Shortly after he arrived, the police came and arrested him for violating his probation by possessing a gun. They took him to the police station, where he gave another statement about the shooting, this time telling "the whole truth." Ballinger testified that he told the police the truth at that time because they were attempting to implicate him in the shooting. The police made no promises about what would happen with the violation of probation charges if Ballinger cooperated in their investigation of the shooting. When Ballinger appeared in court on the violation of probation charges the next day, the court released him on a promise to appear.

Several weeks later, Ballinger heard that Ricky Gomez had been incarcerated and became afraid that Ricky Gomez would learn about his statement to the police and tell the defendant about it. Ballinger went to his mother's house in New York and failed to appear for a January 5, 2000 court date. Four or five months later, he was arrested by agents of the Federal Bureau of Investigation and was returned to Norwich. Thereafter, he was charged with and convicted of firearm offenses and violation of probation, for which he served sentences of imprisonment and probation. At the time of his testimony, he was incarcerated on probation violation charges. He never entered into an agreement with the state concerning his testimony in connection with this case.

Although Ellis testified that he had recognized the defendant as the person who shot him when the cloth covering his face slipped, he told the police during an interview at the hospital on the night of the shooting that he had been shot by "Ricky Gomez and his boys."[34] Ellis again spoke to the police in November, 1999, and February, 2000, and told them that the person who had shot him was wearing black pants and a white shirt, and that his face was covered by a towel. He did not tell the police at those times that he was able to recognize the defendant when the towel slipped down. Ellis testified that he did not identify the defendant as the shooter early in the investigation because he did not trust the police and was going to "have someone from [his] family take care of [the defendant] . . . ."

During the pendency of this case, a number of charges were pending against Ellis for violation of probation and other offenses for which he could have been sentenced to a minimum of five years and a maximum of forty-eight years in prison. Ellis entered into a plea agreement on the charges under which he received a sentence of six years in prison. Ellis, however, denied that he ever entered into an agreement with the state concerning his testimony in the present case.

On the night of the shooting, Ballinger wore a distinctive blue and yellow football jersey with the number thirty-two on it. Two witnesses, Tracy Roman and John Hudson, testified that the shooter had been wearing that type of jersey, and Roman testified that the shooter had covered his face with a cloth of some type. Another witness, Rena Cook, testified[35] that the person who came out of the bathroom firing a gun had the same

---

[34] Ellis testified that he told the police that "Ricky Gomez and his boys" shot him. Detective Rankowitz testified that Ellis told him that he thought that Ricky Gomez had shot him.

[35] Cook's testimony from one of the defendant's prior trials was read into the record.

build as Ricky Gomez, and that she was "quite able to say" that the person was not the defendant.

At the conclusion of the state's case, defense counsel moved for judgment of acquittal on the ground that the state had not proved beyond a reasonable doubt that the defendant was the shooter. The trial court denied the motion. Defense counsel renewed the motion at the close of evidence, and, again, the trial court denied it. Defense counsel filed a third motion for judgment of acquittal after the verdict, which also was denied.

The defendant claims on appeal that, as a matter of law, the evidence presented at trial established a reasonable doubt that he was the shooter. Specifically, the defendant contends that Ellis' belated and inconsistent claim that he had been able to recognize him as the shooter when the cloth covering his face slipped down was not credible. He further contends that Ballinger's statements about the defendant's actions immediately before the shooting were unbelievable because Ballinger made them only after credible witnesses had identified Ballinger as the shooter. We reject the defendant's claim of evidentiary insufficiency.

"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions

need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Gary*, 273 Conn. 393, 405–406, 869 A.2d 1236 (2005); see also *State* v. *Morgan*, 274 Conn. 790, 800, 877 A.2d 739 (2005) ("[W]e do not sit as a thirteenth juror who may cast a vote against the verdict based [on] our feeling that some doubt of guilt is shown by the cold printed

record. . . . Rather, we must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude." [Internal quotation marks omitted.]).

"[W]hen determining whether a witness had sufficient time to observe a defendant to ensure a reliable identification, we have stated that a good hard look will pass muster even if it occurs during a fleeting glance. . . . In particular, we have recognized that a view of even a few seconds may be sufficient for a witness to make an identification . . . and that it is for the trier of fact to determine the weight to be given that identification." (Citations omitted; internal quotation marks omitted.) *State* v. *Morgan,* supra, 274 Conn. 801–802.

In the present case, the defendant does not dispute that the jury reasonably could have concluded beyond a reasonable doubt that he had a motive to shoot Ellis and his associates, that he was present at the club at the time of the shooting and that he had possessed the gun that was used in the shooting. He suggests, however, that Ricky Gomez and Ballinger also harbored animus toward Ellis and his associates, were present at the club and may have had access to the gun, and that the strongest evidence that the defendant was the shooter, that is, Ellis' identification of him as the shooter, was not credible. Ellis, however, provided explanations for his failure to identify the defendant as the shooter immediately after the shooting and for the other discrepancies in his statements. The credibility of these explanations was a matter for the jury to consider and decide. Moreover, although the defendant established that Ellis was not entirely forthcoming early in the police investigation, that he harbored animus toward the defendant and that he had a motive to cooperate with the state in its investigation of the defendant, the defendant did not establish a motive for Ellis to

identify the defendant as the shooter instead of Ricky Gomez or Ballinger, against whom he also harbored animus.

The jury also was not required to credit the testimony of the witnesses who testified that the shooter had worn a jersey like the one Ballinger was wearing. Our careful review of the trial testimony indicates that the scene in the club at the time of the shooting was extremely frightening and chaotic, with people screaming, ducking for cover and scrambling to get out of the building. Ballinger testified that he entered the club within seconds of the shots having been fired and was carrying a gun. Under these circumstances, it is not surprising that some witnesses concluded that he was the shooter. The jury was not compelled, however, to accept their testimony over Ellis' and Ballinger's testimony implicating the defendant. Accordingly, we conclude that the evidence was sufficient for the jury to find beyond a reasonable doubt that the defendant committed the crimes of which he was convicted.

## III

We finally address the defendant's claim that the trial court improperly instructed the jury on the reasonable doubt standard in violation of his federal constitutional right to a fair trial.[36] We disagree.

The following additional procedural history is relevant to our resolution of this claim. The defendant submitted a request to charge on the reasonable doubt standard in which he objected to, inter alia, any instruction stating that a reasonable doubt is (1) "a doubt for which a reasonable person can give a valid reason," (2) "not a slight doubt, nor a possible doubt nor . . . a surmise, a guess or a conjecture," or (3) "a real or

---

[36] To the extent that the defendant purports to assert a state constitutional claim, we decline to review it because he has not analyzed that claim separately under the state constitution. See, e.g., *State* v. *Sinvil*, 270 Conn. 516, 518 n.1, 853 A.2d 105 (2004).

honest doubt for which a valid reason can be given
. . . ." (Internal quotation marks omitted.) In support
of his objection to any suggested charging language,
the defendant asserted that "[s]uch language dilutes
the presumption of innocence and reduces the state's
burden of proof . . . ." The trial court instructed the
jury in relevant part that a reasonable doubt "is some-
thing more than a guess or surmise" "is a real doubt,
[and] an honest doubt," and "is one from which you
can, in your own mind, conscientiously give a reason."[37]
Thereafter, defense counsel took exception to the por-
tion of the charge defining reasonable doubt as a doubt
for which a juror can give a reason. The trial court took
note of the exception but concluded that the charge as

---

[37] The trial court instructed the jury on reasonable doubt as follows: "[T]he
phrase reasonable doubt has no technical meaning. You can arrive at the
real meaning of it by emphasizing the word reasonable. A reasonable doubt
means a doubt based upon reason and common sense. *It is a doubt which
is something more than a guess or surmise.* It is not conjecture or a fanciful
doubt, nor is it doubt raised by one question simply for the sake of argument.
It is not hesitation springing from feelings of sympathy or pity for the accused
or members of his family or other persons who might in any way be affected
by your verdict.

"A reasonable doubt, in other words, *is a real doubt, an honest doubt,* a
doubt which has its foundation in the evidence or lack of evidence. *It is
one from which you can, in your own mind, conscientiously give a reason.*
Reasonable doubt is the kind of doubt which would cause reasonable per-
sons like yourself to hesitate to act in matters of importance. Proof beyond
a reasonable doubt is proof which precludes every reasonable hypothesis
except guilt and is inconsistent with any other reasonable conclusion.

"Now, of course, absolute certainty in the affairs of life is almost never
attainable, and the law does not require absolute certainty on the part of
the jury before you return a verdict of guilty. The state does not have to
prove guilt beyond all doubt or to a mathematical or absolute certainty.
What the law does require, however, is that, after hearing all the evidence,
if there is something in that evidence or lack of evidence which leaves in
the minds of the jury as reasonable men and women a reasonable doubt
*about the guilt of the accused, then the accused must be given the benefit*
of that doubt and acquitted. On the other hand, if you find that the proven
facts do establish the guilt of the accused beyond a reasonable doubt, then
the proper verdict would be guilty." (Emphasis added.)

The defendant challenges the italicized portion of the jury instructions.

given was appropriate. On appeal, the defendant renews the objections that he raised in his request to charge.

"It is fundamental that proof of guilt in a criminal case must be beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) . . . . The [reasonable doubt concept] provides concrete substance for the presumption of innocence—that bedrock axiomatic and elementary principle whose enforcement lies at the foundation of the administration of our criminal law. . . . [Id.], 363. At the same time, by impressing upon the [fact finder] the need to reach a subjective state of near certitude of the guilt of the accused, the [reasonable doubt] standard symbolizes the significance that our society attaches to the criminal sanction and thus to liberty itself. *Jackson* v. *Virginia*, [443 U.S. 307, 315, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)]. [Consequently] [t]he defendants in a criminal case are entitled to a clear and unequivocal charge by the court that [their] guilt . . . must be proved beyond a reasonable doubt. . . .

"In determining whether a trial court's charge satisfies constitutional requirements, however, individual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury." (Citation omitted; internal

quotation marks omitted.) *State* v. *Griffin*, 253 Conn. 195, 205–206, 749 A.2d 1192 (2000).

We first address the defendant's claim that the trial court improperly charged the jury that a reasonable doubt "is one for which you can, in your own mind, conscientiously give a reason." This court repeatedly has held that this language is not constitutionally defective. E.g., *State* v. *Reynolds*, 264 Conn. 1, 106–107, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004); *State* v. *Lewis*, 245 Conn. 779, 816–18, 717 A.2d 1140 (1998). Nevertheless, the defendant claims that the instruction was improper because "people often act, or refuse to act, based on a doubt for which no convincing reason can be formulated or articulated," and notes that we previously have disapproved of similar language.

In *State* v. *Campbell*, 225 Conn. 650, 626 A.2d 287 (1993), the defendant claimed on appeal that the trial court improperly had instructed the jury that "[a] reasonable doubt is a doubt for which a valid reason can be assigned." (Internal quotation marks omitted.) Id., 661. Because the defendant in *Campbell* had failed to object to the instruction, he sought to prevail on appeal under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), which governs review of unpreserved constitutional claims. We concluded that the instruction was not constitutionally defective but cautioned that "our decision . . . should not be construed to endorse the use of this potentially confusing instruction." *State* v. *Campbell*, supra, 662. Similarly, in *State* v. *Ireland*, 218 Conn. 447, 590 A.2d 106 (1991), we disapproved of an instruction defining reasonable doubt as "a doubt for which if necessary you can give an explanation of to your fellow jurors in the jury deliberation room," but concluded that the language was not unconstitutional and did not warrant reversal. (Internal quotation marks omitted.) Id., 457.

We do not believe that the language that the defendant challenges in the present case, when viewed in the context of the entire charge, was misleading or confusing. First, the language is less problematic than the language that we disapproved of in *Campbell* and *Ireland* because the language in the present case emphasizes that the jurors need only be able to give a reason for doubt in their *own minds*, and does not suggest that they ever would be called on to articulate those reasons to others. Second, even when the trial court has used the expressly disapproved language, we have concluded that it does not constitute reversible error if the jury charge is otherwise adequate. See, e.g., id., 457.

We next address the defendant's claim that the trial court improperly instructed the jury that a reasonable doubt is "a real doubt, [and] an honest doubt . . . ." In support of this claim, the defendant relies on language in *United States* v. *Nickens*, 955 F.2d 112 (1st Cir.), cert. denied, 506 U.S. 835, 113 S. Ct. 108, 121 L. Ed. 2d 66 (1992), that "equating reasonable doubt with real doubt reduces the government's burden [of proof] because in common parlance, to have a 'real doubt' is to think there is a high likelihood of error." Id., 120 n.4. In using that language, however, the court in *Nickens* was merely describing the claim made by the defendant in that case. Id. The court ultimately held that, although "such an instruction is confusing, it is perhaps not in itself reversible error." (Internal quotation marks omitted.) Id., quoting *Taylor* v. *Kentucky*, 436 U.S. 478, 488, 98 S. Ct. 1930, 56 L. Ed. 2d 468 (1978). This court consistently has held that this language is not constitutionally defective; see, e.g., *State* v. *Colon*, 272 Conn. 106, 232–34 and n.83, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed 2d 116 (2005); and the defendant has provided us with no compelling reason to deviate from that determination in the present case.

The defendant also contends that the trial court improperly instructed the jury that a reasonable doubt is "something more than a guess or a surmise." In support of this claim, he relies on the decision of the Supreme Court of Indiana in *Winegeart* v. *State,* 665 N.E.2d 893 (Ind. 1996). That court reasoned that "[t]he existence of reasonable doubt precludes a finding of guilt. Viewed in this way, the reasonable-doubt instruction is *necessarily an attempt to define a negative concept.* When court instructions proceed to define this concept by stating what it is *not,* the resulting double negative concept diminishes juror comprehension even further. In addition, we perceive that instructions containing repeated statements narrowing the class of doubts eligible for consideration as reasonable doubt may have a cumulative effect of minimizing the value and importance of this bedrock principle of criminal justice." (Emphasis in original.) Id., 901. The court in *Winegeart* did not conclude, however, that defining reasonable doubt in such terms necessarily is constitutionally defective; id., 902–903; and this court has rejected the claim that it is improper to define reasonable doubt as "something more than a guess or a surmise." *State* v. *Lemoine,* 256 Conn. 193, 202, 204, 770 A.2d 491 (2001). We persist in the view that the instruction, when considered in light of the charge as a whole, is not improper. Accordingly, we reject the defendant's claim that the trial court's jury instructions unconstitutionally diluted the presumption of innocence and reduced the state's burden of proving the defendant guilty beyond a reasonable doubt.

The judgment is affirmed.

In this opinion the other justices concurred.